**DANIEL K. REISING,** OSB No. 90410
dan@frllp.com
Fucile & Reising LLP
Portland Union Station
800 NW 6th Ave., Ste 211
Portland OR 97209
Telephone: 503.224.4894
Facsimile: 503.224.4332

Attorneys for Portland General
Electric Company

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

PORTLAND GENERAL ELECTRIC
COMPANY, an Oregon corporation,

      Plaintiff,

    v.

LIBERTY MUTUAL INSURANCE
COMPANY, a Massachusetts corporation,

      Defendant.

No. 3:15-cv-00217 HZ

**PORTLAND GENERAL ELECTRIC
COMPANY'S MOTION FOR
SUMMARY JUDGMENT AND
LEGAL MEMORANDUM IN
SUPPORT**

**Request for Oral Argument**

### MOTION

Portland General Electric Company (PGE) moves for summary judgment

pursuant to FRCP 56(c) on the grounds that there is no genuine issue of fact for trial

and PGE is entitled to judgment as a matter of law. In compliance with LR 7-1 counsel

certifies that the parties made a good faith effort through telephone conferences to

resolve the dispute and have been unable to do so.

PGE respectfully requests that the Court:

1    PORTLAND GENERAL ELECTRIC COMPANY'S
    MOTION FORSUMMARY JUDGMENT
    AND LEGAL MEMORANDUM IN SUPPORT

            fucile & reising LLP
            800 nw 6th ave, ste 211
            portland or 97209
            p 503.224.4894
            f 503.224.4332

1.      Declare that Liberty Mutual Insurance Company owes PGE a duty of defense;

2.      Declare that Liberty Mutual owes PGE a duty of indemnity; and

3.      Enter a money judgment in favor of PGE, in an amount to be determined.

This motion is supported by the following Legal Memorandum and the attached Appendix of Exhibits.

## LEGAL MEMORANDUM

### I. FACTS

**A.  PGE and NAES**

Portland General Electric Company (PGE) owns and operates a coal burning electric power plant in Boardman, Oregon.  On December 17, 2008, PGE and NAES Power Contractors entered into a written agreement for NAES to perform maintenance at the Boardman Coal Plant. (Contract No. TBDM000125).  Relevant portions of the Maintenance Contract are attached as Exhibit 1 in the Appendix of Exhibits to this Memorandum.

**B.  The Insurance Policy**

The Maintenance Contract obligated NAES to procure, among other insurance, commercial general liability insurance naming "PGE, its directors, officers and employees as Additional Insureds by endorsement or otherwise."  Ex. 1 at Article 28, page 13.  To meet its obligation under the Maintenance Contract, NAES provided PGE with a Certificate of Liability Insurance identifying PGE as an Additional Insured on a

fucile & reising LLP
800 nw 6th ave, ste 211
portland or 97209
p 503.224.4894
f 503.224.4332

commercial general liability insurance policy issued by defendant Liberty Mutual

Insurance Company.  Ex. 2.

Pursuant to a "Blanket Additional Insured Endorsement", the policy's definition of

insured includes "as an insured any person or organization for whom you have agreed

in writing to provide liability insurance."  Ex. 3.  Another policy endorsement provides

that the policy covers liability for "bodily injury" assumed in a contract or agreement, and

provides that Liberty Mutual will defend "any claim made or 'suit' brought against the

indemnitee."  Ex. 4, ¶¶ 1(b)(2) and 2.

The policy defines coverage:

> "We will pay those sums that the insured becomes legally
> obligated to pay as damages because of 'bodily injury' or
> 'property damage' to which this insurance applies.  We will
> have the right and duty to defend the insured against any
> 'suit' seeking those damages.  Ex. 5 ¶ 1.a

## C.  The Underlying Action and Tender to Liberty Mutual

Joel Belgarde was employed by NAES as a boilermaker to perform work at the

Boardman Coal Plant pursuant to the Maintenance Contract.  On April 16, 2014 Mr.

Belgarde filed a civil action against PGE in Multnomah County Circuit Court seeking

$680,000 in economic and non-economic damages due to an injury he allegedly

sustained May 2, 2012 while working for NAES.  Ex. 6.  Following receipt of the

summons and complaint, on May 8, 2014, PGE tendered defense of the action to

Liberty Mutual.  Ex. 7.  Liberty Mutual did not respond to the tender.  Instead, an

attorney for NAES advised PGE by letter dated June 25, 2014 that he believed *NAES*

was not obligated to indemnify or insure PGE as a matter of Oregon law.  Ex. 8.  The

fucile & reising LLP
800 nw 6th ave, ste 211
portland or 97209
p 503.224.4894
f 503.224.4332

letter did not purport to be a response from Liberty Mutual.  PGE, by email dated June 25, 2014, again requested that Liberty Mutual provide the defense and indemnity required by the insurance policy.  Ex. 9.  PGE received no response.

PGE denies that it owed any duty to Mr. Belgarde and/or that the accident was caused by anything PGE did or did not do.  PGE alleges in this federal action that the accident was caused by NAES.  The evidence developed through discovery in the underlying action bears out PGE's allegation.

**D.  Evidence in the Underlying Action**

The state court complaint alleges plaintiff was injured while working at the Boardman Coal Plant with an "air cannon", installing basketed heating elements that weighed 150 to 600 pounds.  A hand drawn depiction of the "air cannon" tool is included at paragraph 6 of Exhibit 6.  Below is a photograph of a nearly identical tool[1], followed by a closeup of the main and safety valves on the tool Mr. Belgarde testified he used:



---

[1] Photographs taken of the actual tool did not turn out nearly as well as this photograph of another, functionally identical, tool used by NAES at the Boardman Coal Plant.

fucile & reising LLP
800 nw 6th ave, ste 211
portland or 97209
p 503.224.4894
f 503.224.4332



The tool is used by boilermakers to move heavy objects.  Ex. 10 at 48:20-49:3.  A piston attached to the square steel ram at the right end of the tool is driven by compressed air and extends to push heavy objects into place.  A compressed air hose attaches to the left end of the tool.  The main valve to actuate the tool is the first valve in line, moving left to right from the right end of the tool as depicted above.  The next valve in line is the safety valve.  When open, the safety valve allows compressed air to flow out of the tool (assuming the main valve is also open) without actuating the ram.  *Id.* 63:15-64:3.  In order to work, the tool must be chained to the grated floor of the work area, or else it will recoil backwards, rather than push the ram forward.

Mr. Belgarde prepared a handwritten statement after he was injured.  He stated, as he did in the underlying complaint, the accident occurred when a loop on his overalls caught the main valve of the tool and opened that valve.  This caused compressed air to

fucile & reising LLP
800 nw 6th ave, ste 211
portland or 97209
p 503.224.4894
f 503.224.4332

rush through that valve and out the safety valve of the tool. Mr. Belgarde's co-worker closed the safety valve, causing the tool to recoil backward with force. Ex. 11 at 3.

Mr. Belgarde was deposed February 9, 2015. He testified he was working as a NAES employee when his assistant foreman told him to use the air cannon tool, even though he had never used the tool before. Ex. 10 at 52:3-53:10. The tool was designed and built by union Boilermakers in the mid-1990s and has been used by the Boardman maintenance contractor since then. *Id.* 46:14-47:25. Although Mr. Belgarde had seen it being used before, neither he nor his coworker, Shawn Niemeyer (also a NAES employee) received any training on the use of the tool. *Id.* 52:3-53:10. They were, for example, not trained to shut off the compressed air at its source before moving the tool.[2] *Id.* 54:9-14.

As in his handwritten statement and the underlying complaint, Mr. Belgarde testified he and Mr. Niemeyer were moving the tool with the main valve closed, and the safety valve open, when the handle of the main valve caught in a loop in Mr. Belgarde's overalls and was accidentally opened. *Id.* 68:14-69:3. As Mr. Belgarde testified, this caused the tool to be "actuated." *Id.* Then, according to underlying complaint: "Plaintiff's co-worker instinctively reached for the safety valve and closed it which caused the air cannon to shoot backwards with great force, causing severe injury to plaintiff." Ex. 6 at 3, ¶ 9. *See also* Ex. 10 at 72:4-9. Because the tool was not chained down, it recoiled backward with Mr. Belgarde holding onto it. *Id.* 72:14-20.

---

[2] Mr. Belgarde testified the tool was connected to a compressed air supply that was two flights of stairs up from his work area. *Id.* 66:21-24. He also testified he did not recall whether there was an "in-line" shut off valve that would have allowed him to shut off the air supply in his work area. *Id.* 55:17-19. He did not shut the air off at the source for convenience sake. *Id.* 64:4-10. The evidence at trial will be there was a source of compressed air just steps away from Mr. Belgarde's work area.

fucile & reising LLP
800 nw 6th ave, ste 211
portland or 97209
p 503.224.4894
f 503.224.4332

Mr. Belgarde's right biceps was injured as a result of the accident.  He applied for and has, so far, received approximately $200,000 in workers compensation benefits.  Ex. 12.  A "date certain" trial in the underlying action is set for July 20, 2015.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of America v. Phelps Dodge,* 865 F.2d 1539, 1542 (9th Cir.1989).

### B.  Oregon Statutes Do Not Void Liberty Mutual's Duties to PGE

The facts should not be in dispute.  The issue is purely legal:  Where PGE is an additional insured on a Liberty Mutual CGL policy written for a PGE contractor, does Oregon law void Liberty Mutual's obligation to defend and indemnify PGE under that policy?  Other judges in this District have addressed the same, or very similar, issues on several occasions.  Each case involves an underlying tort action brought by an injured worker employed by a subcontractor.  In each case, the general contractor is named as defendant in the underlying action.  In each case, the general contractor is also an "additional insured" on the subcontractor's liability insurance policy.  And, in each case

fucile & reising LLP
800 nw 6th ave, ste 211
portland or 97209
p 503.224.4894
f 503.224.4332

the general contractor brought an action against the subcontractor's insurer for

enforcement of the general contractor's right to coverage under the policy. Each time,

the Court has ruled in favor of the "additional insureds" and rejected the insurers'

arguments that Oregon law voids an insurer's duties or otherwise negates an additional

insured's rights. A summary of decisions from the last 10 years includes:

- *Tudor Ins. Co. v. Wright*, 2005 WL 425464 (February 18, 2005) (Judge Marsh adopting Report and Recommendation from Magistrate Judge Stewart that the additional insured was entitled to indemnity and defense from the insurer so long as the subcontractor "played a role in causing the accident." at *1);

- *Hoffman Construction Company of Oregon v. Travelers Indemnity I Insurance Company*, 2005 WL 3689487 (November 28, 2005) (Judge Aiken finding that Oregon law permits construction agreements that require a subcontractor to obtain an "additional insured" endorsement in favor of a general contractor and, therefore, obligating the subcontractor's insurer to defend the general contractor in an underlying state tort action);

- *Richardson v. Howard S. Wright Construction Co.*, 2007 WL 1467411 (May 18, 2007) (Magistrate Judge Stewart finding "no reason to revisit *Tudor*" and rejecting the argument that an agreement to provide insurance is void under Oregon law;

- *Continental Casualty Insurance Co. v. Zurich American Insurance Co.*, 2009 WL 231463 (January 29, 2009) (Judge King finding that under Oregon law a provision requiring a subcontractor to procure insurance is enforceable);

- *Clarendon National Insurance Company v. American States Insurance Company*, 688 F Supp2d 1186 (D. OR. 2010) (Judge Jones finding that Oregon law does not preclude subcontractor's insurer's coverage obligation);

- *American Hallmark Insurance Co. of Texas v. American Family Insurance Co.*, 2011 WL 2199155 (June 9, 2011) (Judge Aiken finding that Oregon law does not preclude the subcontractor's insurer's indemnity obligation to the extent the subcontractor's negligence caused the plaintiff in the underlying action's loss).

fucile & reising LLP
800 nw 6th ave, ste 211
portland or 97209
p 503.224.4894
f 503.224.4332

### 1. ORS 30.140

The Oregon law addressed in all these decisions is ORS 30.140.  That statute provides that a provision in a construction contract requiring a contractor to indemnify an owner (or another contractor) from the indemnitee's own negligence is void.  ORS 30.140(1).  This statute has also been construed by the Oregon Supreme Court to invalidate an additional insured requirement, if the contractor is required to procure additional insurance for losses *arising from the indemnitee's sole fault.  Walsh Construction Co. v. Mutual of Enumclaw*, 338 Or 1, 4, 104 P3d 1146 (2005).

What distinguishes PGE's position, and the plaintiffs' positions in the cases referenced above, from the reach of ORS 30.140(1) and the holding of *Walsh*, is that PGE is *not seeking indemnity for a loss arising from PGE's sole fault.*  Mr. Belgarde's injury was caused by NAES in at least the following particulars:  1) NAES's failure to train its employees, Mr. Belgarde and Mr. Neiemeyer, in the safe operation of the air cannon; 2) NAES's failure to require the same employees to follow commonsense safety practices, such as turning off the source of compressed air before moving a tool referred to as an "air cannon"; 3) NAES's failure to provide an "in-line" shut off valve that would have allowed Mr. Belgarde or a co-worker to shut off the compressed air without having to climb two flights of stairs; 4) NAES's failure to use a source of compressed air closer to where the work was being performed, so the compressed air could more conveniently be shut off before the tool was moved; 5) a NAES employee's (Mr. Belgarde's) negligence in allowing a loop on his overalls to open the main valve of the air cannon while moving it; 6) a NAES employee's (Mr. Niemeyer's) negligence in

fucile & reising LLP
800 nw 6ᵗʰ ave, ste 211
portland or 97209
p 503.224.4894
f 503.224.4332

shutting off the safety valve of the air cannon after the main valve opened; 7) NAES's

failure to inspect and maintain the air cannon before use to determine if the valves

needed to be replaced or reconfigured (as Mr. Belgarde contends in the underlying

action); and 8) NAES's failure to protect its employees from what Mr. Belgarde contends

is an unsafely designed tool.  Ex. 6, ¶ 9.  Taking the salient fact that NAES's negligence

caused the accident into account, there is no possible argument that ORS 30.140(1)

and *Walsh* relieve Liberty Mutual of its duties to defend and indemnify PGE in the

underlying action.

### 2.  ORS 656.018

In addition to ORS 30.140(1), PGE anticipates Liberty Mutual may also argue

that Oregon's workers compensation law (ORS 656.018(1)(a)) immunizes NAES, and

therefore Liberty Mutual, from liability to PGE.  This argument was rejected by Judge

Jones in *Clarendon*, 688 F Supp2d at 1189.  It should be rejected here for the same

reason.  ORS 656.018(1)(a) makes an employer immune from liability, including "claims

for contribution or indemnity asserted by third persons from whom damages are

sought."

Judge Jones concluded the statute "does not void defendant's agreement to

purchase liability insurance, nor does it void the 'additional insured' provisions."  688 F

Supp 2d at 1189.  That ruling relies upon an en banc decision of the Oregon Court of

Appeals:  *Montgomery Elevator Co. v. Tuality Community Hospital, Inc.*, 101 Or App

299, 790 P2d 1148 (1990) (en banc).  There, the question was whether ORS

656.018(1)(a) voided an agreement by a contractor to purchase liability insurance in

fucile & reising LLP
800 nw 6th ave, ste 211
portland or 97209
p 503.224.4894
f 503.224.4332

favor of a landowner on whose premises the contractor was working when the contractor's employee was injured, *i.e.* the same facts presented here. The contractor argued that indemnity agreements and agreements to procure insurance are identical and are both void under Oregon law. The Court of Appeals disagreed:

> "'[A] promise to obtain insurance is not the same as a promise to indemnify. * * *. Under an indemnity agreement, the promisor agrees to assume all responsibility and liability for any injuries and damages. Under an agreement to obtain insurance, the promisor merely agress to procure the insurance and pay the premium on it. Once the insurance is obtained, the promisor bears no responsibility in the event of injury or damage even if the insurer should breach the insurance agreement through no fault of the promisor.'" *Montgomery Elevator*, 101 Or App at. 303, *quoting Zettel v. Paschen Contractors, Inc.,* 100 Ill.App.3d 614, 618, 56 Ill.Dec. 109, 427 N.E.2d 189 (1981) (Other citations omitted in original.)

Under Oregon law NAES's contractual obligation to insure PGE is enforceable, as is the underlying insurance policy issued by Liberty Mutual.

## C. Liberty Mutual Owes PGE Duties of Defense and Indemnity

With neither ORS 30.140 nor 658.018 voiding the additional insured endorsement and PGE's right to coverage under the policy, the question becomes whether PGE is entitled to a defense of the underlying action, indemnity for any losses incurred or both. The answer is: both.

Oregon law distinguishes an obligation to indemnify against loss from an obligation to provide a defense. The difference is that a duty to defend is triggered by the bare allegations of the complaint in the underlying action, while an indemnity obligation arises "by proof of actual facts demonstrating a right to recover." *Id.* at 1192-93 *citing Ledford v. Gutoski*, 319 OR 397, 399-400, 877 P2d 80 (1994); *Northwest Pump & Engineering Co. v. American States Ins. Co.*, 144 Or App 222, 226-27 (1996).

fucile & reising LLP
800 nw 6th ave, ste 211
portland or 97209
p 503.224.4894
f 503.224.4332

The allegations of the underlying complaint establish that PGE is entitled to a defense under settled Oregon law. And, the uncontested facts presented by this motion establish that PGE is entitled to indemnification.

### 1. Liberty Mutual Owes PGE a Duty of Defense

> "The insurer has a duty to defend if the complaint provides *any basis* for which the insurer provides coverage. Even if the complaint alleges some conduct outside the coverage of the policy, the insurer may still have a duty to defend if certain allegations of the complaint, without amendment, could impose liability for conduct covered by the policy. Any ambiguity in the complaint with respect to whether the allegations could be covered is resolved in favor of the insured." *Ledford*, 319 Or at 400 (citations omitted) (emphasis in original).

In other words, whether the insurer owes a duty to defend depends on whether the underlying complaint includes allegations that "raise by implication the possibility that [NAES] was at fault in a way that triggers coverage under the additional insured endorsements." *Clarendon* at 1192. Here, the complaint includes such allegations. Mr. Belgarde alleges in his complaint that a NAES employee (Mr. Belgarde) allowed a loop in his overalls to accidentally open the main valve of the air ram while he was moving that tool. And his co-worker, also a NAES employee, closed the safety valve, causing the air ram to actuate. At a bare minimum, these allegations imply that NAES was at fault and had at least some role in causing the accident. Thus, under the reasoning of *Ledford*, Liberty Mutual owes PGE a defense of the underlying action. PGE respectfully requests that the Court declare that Liberty Mutual owes this duty and award PGE its defense costs incurred in the underlying action as a consequence of Liberty Mutual's

fucile & reising LLP
800 nw 6ᵗʰ ave, ste 211
portland or 97209
p 503.224.4894
f 503.224.4332

breach of its duty to defend. If necessary, PGE requests an opportunity to present evidence of the costs and expenses it has incurred.

### 2. Liberty Mutual Owes PGE a Duty of Indemnity

> "The duty to indemnify is independent of the duty to defend. Even when an insurer does not have a duty to defend based on the allegations in the initial complaint, the facts proved at trial on which liability is established may give rise to a duty to indemnify if the insured's conduct is covered. *Ledford* at 403 (citations omitted).

The facts presented by PGE's motion demonstrate that not only was the accident caused when Mr. Belgarde accidentally opened the main valve of the tool and his co-worker closed the safety valve, but a NAES assistant foreman told Mr. Belgarde and his co-worker to use the tool, without training either of them on its safe use. These facts establish that NAES played a role in causing the underlying accident. There is no genuine question of fact for trial that NAES bears responsibility for the accident. Because the facts establish that NAES is liable for the conduct covered by the policy, PGE is entitled to be indemnified for any damages incurred in connection with the accident and respectfully requests that the Court declare that Liberty Mutual owes PGE such indemnification.

## III. CONCLUSION

For all of the reasons stated above, PGE respectfully requests that the Court grant summary judgment in its favor.[3] PGE further requests that the Court:

1. Declare that Liberty Mutual owes PGE a duty of defense in the underlying action;

---

[3] PGE reserves the right to petition for an award of its attorney fees incurred in this action.

fucile & reising LLP
800 nw 6th ave, ste 211
portland or 97209
p 503.224.4894
f 503.224.4332

2.      Declare that Liberty Mutual owes PGE a duty of indemnity in the

underlying action; and

3.      Enter a money judgment in favor of PGE for the costs and expenses it has

incurred defending itself in the underlying action, in an amount to be determined.

Dated:  March 6, 2015.

FUCILE & REISING LLP


/s/ Daniel K. Reising_____
Daniel K. Reising, OSB No. 96410
Portland Union Station
800 NW 6th Ave., Ste 211
Portland OR 97209
Tel. 503.224.4894
Fax 503.224.4332

Attorneys for Plaintiff Portland General
Electric Company

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b)

because it contains 3,546 words.


/s/ Daniel K. Reising_____
Daniel K. Reising, OSB No. 96410

fucile & reising LLP
800 nw 6th ave, ste 211
portland or 97209
p 503.224.4894
f 503.224.4332

# APPENDIX OF EXHIBITS

**Exhibit Number**                                      **Description**

Exhibit 1 …………………………………        Excerpts from PGE/NAES Contract

Exhibit 2 …………………………………        Certificate of Liability Insurance

Exhibit 3 …………………………………        Blanket Additional Insured Endorsement

Exhibit 4 …………………………………        Contractual Liability Exclusion Endorsement

Exhibit 5…………………………………         Excerpts from Liberty Mutual Policy

Exhibit 6…………………………………         Underlying Complaint

Exhibit 7…………………………………         May 8, 2014 Tender to Liberty Mutual

Exhibit 8…………………………………         June 25, 2014 Letter from NAES

Exhibit 9 …………………………………        June 25, 2014 Email to Liberty Mutual

Exhibit 10…………………………………        Excerpts from Joel Belgarde Deposition

Exhibit 11…………………………………        Handwritten Statement of Joel Belgarde

Exhibit 12…………………………………        Summary of Workers Compensation Payments

# EXHIBIT

# 1

**PORTLAND GENERAL ELECTRIC COMPANY**
**AND**
**NAES POWER CONTRACTORS**
**BOARDMAN MAINTENANCE CONTRACT**
**DECEMBER 17, 2008**

**NAES Power Contactors**
**Contract No. TBDM000125**

**INDEX OF ARTICLES:**

| | | |
|---|---|---|
| Article 1. | Description of Work. | 1 |
| Article 2. | Period of Performance. | 2 |
| Article 3. | Consideration. | 2 |
| Article 4. | Payment. | 3 |
| Article 5. | Intent of Special Terms | 3 |
| Article 6. | Specifications and Drawings | 3 |
| Article 7. | Contractor's Representations and Warranties. | 3 |
| Article 8. | Patent and Copyright. | 5 |
| Article 9. | Historical Artifacts. | 6 |
| Article 10. | Contractor-Provided Materials. | 6 |
| Article 11. | Expediting by Company. | 7 |
| Article 12. | Codes, Standards and Permits. | 7 |
| Article 13. | Unforeseen Conditions. | 7 |
| Article 14. | Inspection. | 7 |
| Article 15. | Superintendence by Contractor. | 7 |
| Article 16. | Discovery of Contract Errors, Omissions or Discrepancies. | 8 |
| Article 17. | Changes. | 8 |
| Article 18. | Correction of Work. | 8 |
| Article 19. | Warranty. | 9 |
| Article 20. | Accounting and Auditing. | 9 |
| Article 21. | Cooperation with Others. | 9 |
| Article 22. | Termination for Cause. | 10 |
| Article 23. | Termination for Convenience. | 10 |
| Article 24. | Suspension of Work. | 10 |
| Article 25. | Protection of Work – Preservation of Public/Private Access. | 11 |
| Article 26. | Indemnification. | 11 |
| Article 27. | Protection of Workers. | 11 |
| *Article 28. | Insurance. | 12 |
| Article 29. | Liens. | 14 |
| Article 30. | Assignment. | 15 |
| Article 31. | Independent Contractor | 15 |
| Article 32. | Subcontracts. | 15 |
| Article 33. | Contractor-Furnished Drawings and Data. | 16 |

<u>EXHIBIT 1</u>

| | | |
|---|---|---|
| Article 34. | Use of Premises and Trespass. | 16 |
| Article 35. | Accident Prevention. | 16 |
| Article 36. | Cleanup. | 17 |
| Article 37. | Disputes. | 17 |
| Article 38. | Notices and Demands. | 19 |
| Article 39. | Use of Completed Portions of Work | 19 |
| Article 40. | Progress. | 20 |
| Article 41. | Delays. | 20 |
| Article 42. | Labor. | 21 |
| Article 43. | Site Regulations. | 21 |
| Article 44. | Use of Hazardous Substances. | 21 |
| Article 45. | Contractor's Personnel/Hiring of Convicted Felons/Drugs, Alcohol and Firearms. | 21 |
| Article 46. | Laws and Regulations. | 23 |
| Article 47. | Confidentiality/Nondisclosure. | 23 |
| Article 48. | Release of Information - Advertising and Promotion. | 25 |
| Article 49. | Nonwaiver. | 25 |
| Article 50. | Costs and Attorney Fees. | 25 |
| Article 51. | Severability. | 26 |
| Article 52. | Third Parties | 26 |
| Article 53. | Survival | 26 |
| Article 54. | English Language. | 26 |
| Article 55. | Applicable Law. | 26 |
| Article 56. | Complete Agreement and Effective Date. | 27 |

EXHIBIT 1

and, if applicable, under the federal Longshore and Harbor Workers Compensation Act and the Jones Act. Contractor shall furnish to Company evidence of Contractor's compliance with said Acts, in form acceptable to Company, and during the effective period of this Contract shall not modify such methods of compliance without the written consent of Company.

**Article 28. Insurance.**

<u>**Liability Insurance**</u>

Prior to starting any Work, Contractor and subcontractors of any tier shall secure and continuously carry and supply evidence thereof, with insurers acceptable to PGE (AM Best rating of A- VIII or better), the minimum insurance specified in this Section. Contractor shall be responsible for determining if additional insurance is needed and such additional insurance shall be obtained by Contractor at its own expense. The issuance or maintaining of insurance of any type by Contractor or PGE shall not be deemed or construed to release, limit, waive or discharge Contractor from any and all of the obligations and risks imposed by this Agreement upon Contractor, including any liability in excess of the insurance coverages required herein. Neither shall any forbearance nor omission by PGE to require proof of insurance from Contractor before permitting Contractor to proceed or continue with the Services be deemed a waiver of PGE's rights or Contractor's obligations regarding the provisions of insurance under this Agreement. Contractor shall be responsible for the cost of satisfying any deductible for claims made under the coverage required below.

- <u>**Employers Liability**</u> insurance with limits not less than:

  $5,000,000 each accident for bodily injury by accident
  $5,000,000 policy limit for bodily injury by disease
  $5,000,000 each employee for bodily injury by disease

- <u>**Commercial General Liability**</u> insurance covering all operations by or on behalf of Contractor providing insurance for Bodily Injury Liability and Property Damage Liability for limits of liability indicated below and including coverage for:

  a) premises and operations;
  b) products and completed operations;
  c) contractual liability insuring the obligations assumed by Contractor in this Agreement;
  d) broad form property damage (including completed operations);
  e) bodily injury and personal injury liability; and
  f) explosion, collapse and underground (XCU) hazards (where applicable);

  Except with respect to bodily injury and property damage included within the products and completed operations hazards, the general aggregate limit (where applicable) shall apply separately to the Work under this Agreement.

  If Contractor's insurance coverage is maintained on a claims made basis, such policy shall have a retroactive date on or before the effective date of this agreement and shall

<u>EXHIBIT 1</u>

be maintained for a period of three (3) years following the agreement's termination or expiration. <u>For Contractor, the limits of liability shall not be less than:</u>

$10,000,000 each occurrence

$10,000,000 for personal injury and advertising injury liability
$10,000,000 aggregate for products and completed operations
$10,000,000 general aggregate

**Business Automobile Liability** insurance with a minimum combined single limit of $2,000,000 per accident for bodily injury and property damage with respect to Contractor's vehicles whether owned, hired or non-owned, assigned to or used in the performance of the Work.

**PRIOR TO USING AN AIRCRAFT AND/OR WATERCRAFT OF ANY KIND IN PERFORMING THE WORK UNDER THIS AGREEMENT, CONSULTANT SHALL NOTIFY PGE AND OBTAIN ITS PRIOR WRITTEN CONSENT [if applicable].** If an aircraft and/or watercraft is to be used in performing the Work under this Agreement, Aircraft Liability and/or Protection & Indemnity insurance covering fixed wing, rotorcraft aircraft, and watercraft whether owned, hired or non-owned with a minimum single limit for bodily injury and property damage of $10,000,000 including passenger liability coverage (where applicable) is required.

**Required limits may be met through any combination of primary and excess liability policies.** With the exception of Workers' Compensation and Employers Liability policies required herein shall **(i) name PGE, its directors, officers and employees as Additional Insureds by endorsement or otherwise, and include (ii) a cross-liability and severability of interest clause.** The coverage provided to the Additional Insured must be at least as broad as that provided to Contractor and may not contain any exclusionary language or limitations that are applicable to them, and such endorsements shall be maintained in force until such time as all actions on account of matters covered by this insurance are barred by applicable statute of limitations.

- <u>Contractor shall purchase and maintain, throughout the term of this Contract,</u> property insurance protecting Contractor's property and equipment at the Work site. Any deductible maintained under Contractor's property policy(ies) shall be the responsibility of the Contractor. Such insurance coverage shall waive all rights of subrogation in favor of PGE.

All policies required by this Agreement shall include provisions that such insurance is primary insurance with respect to the interests of PGE and that any other insurance or self-insurance maintained by PGE is in excess of and not contributory with the insurance required hereunder, and provisions that such policies shall not be canceled or their limits of liability reduced without thirty (30) days prior written notice to PGE. A certificate in a form satisfactory to PGE certifying the issuance of such insurance, including required endorsements, shall be furnished to

**EXHIBIT 1**

PGE. Each policy of insurance obtained by Contractor shall provide that the insurer shall defend any suit against the Additional Insureds, even if such suit is frivolous or fraudulent.

All renewal and/or replacement insurance shall comply with all the terms and conditions set forth in this Agreement, and must be delivered to PGE prior to expiration of the previous policy(ies).

With respect to any insurance Contractor may maintain, including but not limited to that set forth herein, Contractor warrants that Contractor has the right to waive any and all rights of subrogation which Contractor's insurance carriers might have or claim against PGE, including its officers, agents, legal counsel, employees, affiliates, parents, and subsidiaries in connection with the Work. Contractor hereby waives all such present and future rights of subrogation and agrees to defend and indemnify PGE, including its officers, directors, agents, legal counsel, employees, affiliates, parents, and subsidiaries in connection with the Work from all such subrogation claims. Contractor shall require of its subcontractors similar waivers. Contractor's and its subcontractor's policies shall provide such waivers by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity did not pay the insurance premium directly or indirectly and whether or not the person or entity had an insurable interest in the property damaged or person injured.

If Contractor or subcontractor(s) fails to secure and maintain the required insurance, PGE shall have the right (without any obligation to do so) to secure same in the name and for the account of the Contractor and subcontractor(s), in which event Contractor or subcontractor(s) shall pay the cost thereof and shall furnish upon demand all information that may be required in connection therewith.

Contractor shall report in writing to PGE all accidents whatsoever arising out of or in connection with the Work which results in death, injuries, or property damage, giving full details and names, addresses and statements of all witnesses. In addition, if death or serious injuries or serious damage occur, the same shall be reported immediately by telephone to PGE. If any claim is made by a third person against Contractor on account of any accident resulting or alleged to have resulted out of the performance of the Work, Contractor shall promptly report the facts in writing to PGE giving full details of the claim.

**This Section will continue in effect following the expiration or termination of this Contract.**

**Article 29. Construction Liens, Final Payment and Final Acceptance.**

Contractor agrees that Company shall have no obligation under ORS § 87.021(4) to deliver copies of notices of right to a lien received by Company from parties purporting to be performing or furnishing Work under this Contract or on the project, and that Company's failure to deliver copies of such notices to Contractor shall have no effect on the obligations of Contractor to hold harmless and indemnify Company for construction liens as required by this Contract or applicable law. Without negating, abridging or reducing the effect of the prior sentence, Company shall make a good faith attempt to deliver promptly to Contractor copies of such notices that Company receives.

EXHIBIT 1

**Article 56.    Complete Agreement and Effective Date.**

This Contract and any referenced attachments constitute the complete agreement between the parties and supersedes all prior negotiations, representations or agreements, whether oral or written, related to the subject matter of this Contract. It is subject to change only by an instrument executed in writing by Company.

**Article 57.    Counterparts.**

This Contract may be executed in any number of counterparts, which together will constitute one instrument.

Contractor

By: _____

Name: Robert J. Moore

Title: President

Date: December 17, 2008

Company

By: _____ (CVE)

Name: Koy Saechao-Ly

Title: Buyer

Date: December 23, 2008

EXHIBIT 1

# EXHIBIT

# 2



# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
05/16/2012

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Marsh USA Inc. 1301 5th Avenue, Suite 1900 Seattle, WA 98101 Attn: Seattle.CertRequest@marsh.com / F: 212-948-4326 | PHONE (A/C, No. Ext): | | FAX (A/C, No): |
| | E-MAIL ADDRESS: | | |
| 21340-PC-ALL-12-13 | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Liberty Mutual Insurance Company | | 23043 |
| INSURED NAES Power Contractors, Inc. Attn: Kim Lemaster 1180 NW Maple Street, Ste 200 Issaquah, WA 98027 | INSURER B : ACE American Insurance Company | | 22667 |
| | INSURER C : Associated Electric & Gas Ins Services Ltd | | 3190004 |
| | INSURER D : American Guarantee & Liability Ins Co | | 26247 |
| | INSURER E : | | |
| | INSURER F : | | |

COVERAGES     CERTIFICATE NUMBER: SEA-001992205-09     REVISION NUMBER: 6

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY [X] COMMERCIAL GENERAL LIABILITY [ ] CLAIMS-MADE [X] OCCUR | | | TB1-691-544505-011 | 11/01/2011 | 11/01/2012 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: [X] POLICY [ ] PRO-JECT [ ] LOC | | | | | | GENERAL AGGREGATE | $ 3,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 1,000,000 |
| | | | | | | | | $ |
| D | AUTOMOBILE LIABILITY [X] ANY AUTO [ ] ALL OWNED AUTOS [ ] SCHEDULED AUTOS [ ] HIRED AUTOS [ ] NON-OWNED AUTOS | | | BAP9830191-02 | 05/20/2012 | 05/20/2013 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | COMP/COLL DED | $ 1,000 |
| C | UMBRELLA LIAB [X] OCCUR EXCESS LIAB [ ] CLAIMS-MADE [X] DED [X] RETENTION $ 200,000 | | | XL5046802P | 05/20/2012 | 05/20/2013 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | AGGREGATE | $ |
| | | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? [N] (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | WLRC4678473A | 05/20/2012 | 05/20/2013 | [X] WC STATU-TORY LIMITS [ ] OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)
RE: NPC-WEST
PORTLAND GENERAL ELECTRIC IS INCLUDED AS ADDITIONAL INSURED WHERE REQUIRED BY WRITTEN CONTRACT AND ALLOWED BY LAW , EXCEPT WORKERS COMPENSATION.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PORTLAND GENERAL ELECTRIC 2213 SW 153RD DRIVE BEAVORTON, OR 97006 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE of Marsh USA Inc. Beverly A. Wold *Beverly A Wold* |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)     The ACORD name and logo are registered marks of ACORD

EXHIBIT 2 

# EXHIBIT

# 3

ı

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**BLANKET ADDITIONAL INSURED**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

SECTION II – WHO IS AN INSURED is amended to include as an insured any person or organization for whom you have agreed in writing to provide liability insurance.  But:

The insurance provided by this amendment:

1.  Applies only to "bodily injury" or "property damage" arising out of (a) "your work" or (b) premises or other property owned by or rented to you;

2.  Applies only to coverage and minimum limits of insurance required by the written agreement, but in no event exceeds either the scope of coverage or the limits of insurance provided by this policy; and

3.  Does not apply to any person or organization for whom you have procured separate liability insurance while such insurance is in effect, regardless of whether the scope of coverage or limits of insurance of this policy exceed those of such other insurance or whether such other insurance is valid and collectible.

The following provisions also apply:

1.  Where the applicable written agreement requires the insured to provide liability insurance on a primary, excess, contingent, or any other basis, this policy will apply solely on the basis required by such written agreement and Item 4. Other Insurance of SECTION IV of this policy will not apply.

2.  Where the applicable written agreement does not specify on what basis the liability insurance will apply, the provisions of Item 4. Other Insurance of SECTION IV of this policy will govern.

3   This endorsement shall not apply to any person or organization for any "bodily injury" or "property damage" if any other additional insured endorsement on this policy applies to that person or organization with regard to the "bodily injury" or "property damage".

4.  If any other additional insured endorsement applies to any person or organization and you are obligated under a written agreement to provide liability insurance on a primary, excess, contingent, or any other basis for that additional insured, this policy will apply solely on the basis required by such written agreement and Item 4. Other Insurance of SECTION IV of this policy will not apply, regardless of whether the person or organization has available other valid and collectible insurance. If the applicable written agreement does not specify on what basis the liability insurance will apply, the provisions of Item 4. Other Insurance of SECTION IV of this policy will govern.

This endorsement is executed by the  **LIBERTY MUTUAL INSURANCE COMPANY**

Premium  $
Effective Date                        Expiration Date
For attachment to Policy No.   TB1-691-544505-011
Audit Basis

Issued To

Countersigned by  _____
                                         Authorized Representative

Issued                        Sales Office and No.                        End. Serial No.

LN 20 01 06 05

**EXHIBIT 3**

NAES000067

# EXHIBIT

# 4

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**CONTRACTUAL LIABILITY EXCLUSION AMENDED**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

1. Exclusion b. of COVERAGE A (Section I Coverages) is replaced by the following:

   b. Contractual Liability

   "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

   (1) That the insured would have in the absence of the contract or agreement; or

   (2) Assumed in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

2. We will defend any claim made or "suit" brought against the indemnitee under an "insured contract" which you are required to defend by the specific terms of such "insured contract", but only to the same extent and on the same terms that we would defend if the indemnitee were the insured under the policy, and then only if all of the following conditions are satisfied:

   (a) the claim or "suit" seeks damages for which the indemnitee is legally entitled to indemnification under the "insured contract",

   (b) the policy covers such damages, and

   (c) the applicable Limit of Insurance with respect to such damages has not been exhausted by payment of judgments or settlements.

3. SUPPLEMENTARY PAYMENTS - COVERAGES A AND B is replaced by the following:

   SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

   1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

      a. All expenses we incur.

      b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

      c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

      d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss earnings up to $250 a day because of time off from work.

      e. All costs taxed against the insured in the "suit".

      f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

LN 24 01 06 05

**EXHIBIT 4**

NAES000101

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

This endorsement is executed by the **LIBERTY MUTUAL INSURANCE COMPANY**

Premium $

Effective Date                    Expiration Date

For attachment to Policy No.      TB1-691-544505-011

Audit Basis

Issued To

Countersigned by _____
                                    Authorized Representative

Issued                 Sales Office and No.              End. Serial No.

LN 24 01 06 05                                    Page 2 of 2

## EXHIBIT 4

NAES000102

# EXHIBIT

# 5



# COMMERCIAL POLICY

TB1-691-544505-011

AEGIS Insurance Services, Inc.
1 Meadowlands Plaza
East Rutherford NJ 07073

Liberty Mutual is the marketing name for the property and casualty insurance operations of Liberty Mutual Group Inc. Products may be written in the following stock insurance company subsidiaries of Liberty Mutual Group Inc.:

- Liberty Mutual Insurance Company
- Liberty Mutual Fire Insurance Company
- Liberty Insurance Corporation
- LM Insurance Corporation
- The First Liberty Insurance Corporation
- Liberty Insurance Company of America
- Liberty Surplus Insurance Corporation
- Liberty County Mutual Insurance Company
- Wausau Business Insurance Company
- Wausau General Insurance Company
- Wausau Underwriters Insurance Company
- Employers Insurance Company of Wausau

Not all products and coverages are available in all companies or jurisdictions.

GPO 4613 R1          Copyright 2009 Liberty Mutual Insurance Company.  All rights reserved.



# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

      (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

 © ISO Properties, Inc., 2006



EXHIBIT 5

NAES000036

# EXHIBIT

# 6

1

2

3

4               IN THE CIRCUIT COURT OF THE STATE OF OREGON

5                    FOR THE COUNTY OF MULTNOMAH

| | |
|---|---|
| 6  **JOEL BELGARDE,** | Case No.: |
| 7                          Plaintiff, | **1404-04814** |
| | **COMPLAINT** |
| 8       v. | (Negligence; Employer Liability Law) |
| 9 | |
| 10  **PORTLAND GENERAL ELECTRIC**<br>**COMPANY, an Oregon corporation,** | PRAYER: $680,000 |
| 11 | |
| | Defendant. |

12

13       Plaintiff alleges as follows:

14                                         1.

15       Plaintiff is a boilermaker.  At all times material to this complaint Plaintiff was employed

16

17   by NAES Corporation to perform work at Defendant's Boardman, Oregon power plant.

18                                         2.

19       Defendant is an Oregon corporation engaged in the production and sale of power.

20   Defendant's principal place of business is located in the City of Portland, Oregon, County of

21   Multnomah.  Defendant owns and operates power plants, including the Boardman, Oregon

22   power plant.

23                                         3.

24       At all times during his work at Defendant's Boardman power plant, Defendant controlled,

25

26   directed and monitored the work Plaintiff performed.

Page  1 - **COMPLAINT**

**EXHIBIT 6**

1

4.

2

On May 2, 2012, Plaintiff was assigned to install basketed heating elements, weighing

3

from 150 to 600 pounds.

4

5.

5

6

Defendant supplied Plaintiff with a device to install the heating elements. The device

7

was referred to as an "air cannon" and was designed to propel the heating elements in to place

8

using high intensity air pressure. Defendant owned and maintained the air cannon.

9

6.

10

A rendering of the side view of the air cannon is as follows:

11



12
13
14
15
16
17
18
19
20
21
22

7.

23

Plaintiff was instructed to move the air cannon from station to station to propel heating

24

elements in to place. The air cannon needed to be lashed to a floor grating with hooks before

25

activation because of the kick back created by the extreme air pressure it utilized.

26

2 - COMPLAINT

Page

HOLLANDER, LEBENBAUM & GANNICOTT
Attorneys at Law
1500 S.W. First Avenue, Suite 700
Portland, Oregon 97201
Tel: (503) 222-2408
fax: (503) 222-0659

**EXHIBIT 6**

8.

The air cannon had two valves, the main valve and a safety valve.

9.

On May 2, 2012, Plaintiff was working with a co-worker. The lever of the main valve of the air cannon caught in a loop in Plaintiff's work overalls while the air cannon was being moved, which activated the air supply to the air cannon. With the noise of the activation, Plaintiff's co-worker instinctively reached for the safety valve and closed it which caused the air cannon to shoot backwards with great force, causing severe injury to Plaintiff. The main valve had a safety catch which would have prevented the activation of the air cannon supply when the lever caught in Plaintiff's overalls if the main valve had been installed in a proper position. The main valve was installed in an improper position which effectively disabled the function of the safety catch. As a result, the air cannon's air supply was activated, thereby causing Plaintiff's injury.

10.

Defendant was negligent in causing injury to Plaintiff and breached its duty of care in one or more of the following particulars.

1. Constructing and/or commissioning the construction of the air cannon, a device it knew or should have known was inherently dangerous.

2. Failing to maintain the air cannon in proper and safe working order.

3. Allowing Plaintiff's to use the air cannon when it knew or should have known the device was inherently dangerous.

Page  3 - **COMPLAINT**

HOLLANDER, LEBENBAUM & GANNICOTT
Attorneys at Law
1500 S.W. First Avenue, Suite 700
Portland, Oregon 97201
Tel: (503) 222-2408
fax: (503) 222-0659

EXHIBIT 6

1    4.  Allowing Plaintiff to use the air cannon when it knew or should have known that the

2        main valve was installed in an improper position which served to disable the safety

3        catch and expose Plaintiff to the type of danger that caused his injury.

4    5.  Failing to reposition the safety catch on the main valve to a proper position to allow

5        the safety catch to function in order to protect Plaintiff from the sort of injury he

6        suffered.

7

8                                            11.

9        As a direct and proximate result of Defendant's negligence, Plaintiff suffered right biceps

10   tendon rupture, damage to his radial nerve, right elbow cubital tunnel syndrome and right radial

11   tunnel syndrome together with related conditions.

12                              **FIRST CLAIM - NEGLIGENCE**

13                                            12.

14

15       As a direct and proximate result of Defendant's negligence, Plaintiff has incurred

16   $30,000 in medical expenses to date.

17                                            13.

18       As a direct and proximate result of Defendant's negligence, Plaintiff has incurred

19   $100,000 in lost wages to date.

20                                            14.

21

22       As a direct and proximate result of Defendant's negligence, Plaintiff has suffered

23   diminished earning capacity in the amount of $250,000.

24   //

25   //

26

Page  4 - COMPLAINT

HOLLANDER, LEBENBAUM & GANNICOTT
Attorneys at Law
1500 S.W. First Avenue, Suite 700
Portland, Oregon 97201
Tel: (503) 222-2408
fax: (503) 222-0659

<u>**EXHIBIT 6**</u>

1      15.

2      As a direct and proximate result of Defendant's negligence, Plaintiff has suffered pain,

3      emotional upset, loss of enjoyment of life and a permanent diminution in his physical abilities all

4      to his general damage in the amount of $300,000.

5      ## SECOND CLAIM – EMPLOYER LIABILITY LAW

6      16.

7      Plaintiff realleges and incorporates by reference paragraphs 1-11.

8

9      17.

10     At all times material to this Complaint Defendant was an employer subject to Employer

11     Liability Law having charge of or responsibility for work involving risk or danger to the

12     employees performing the work.

13

14     18.

15     Defendant had a duty to Plaintiff to operate and maintain machinery, including the air

16     cannon, in compliance with every applicable standard, rule or regulation made or proscribed by

17     the Department of Consumer and Business Services.

18     19.

19     Defendant had control over the work that caused injury to Plaintiff. Plaintiff's employer

20     and Defendant were simultaneously engaged in work on a common enterprise and the actions of

21     Defendant and/or use or operation of Defendant's equipment created the risk to Plaintiff of the

22     type of injury he suffered. Defendant had control over the air cannon which injured Plaintiff.

23

24     20.

25     Defendant violated its duty under the Employer Liability Law in the manner set forth in

26     paragraph 10.

Page   5 - **COMPLAINT**

HOLLANDER, LEBENBAUM & GANNICOTT
Attorneys at Law
1500 S.W. First Avenue, Suite 700
Portland, Oregon 97201
Tel: (503) 222-2408
fax: (503) 222-0659

**EXHIBIT 6**

1                                                21.

2          As a result of Defendant's violation of the Employer Liability Law, Plaintiff suffered the

3   following damages:

4       1.  Pain, emotional upset, loss of enjoyment of life and diminution of physical capacities, all

5           to his general damage in the amount of $300,000.

6       2.  Lost wages and benefits in the amount of $100,000.

7

8       3.  Medical expenses of $30,000.

9       4.  Diminished earning capacity in the amount of $250,000.

10          WHEREFORE, Plaintiff prays for the following relief:

11      A.  On his first claim:

12          1.  Economic damages of $380,000;

13          2.  Non- economic damages of $300,000;

14          3.  Costs and disbursements.

15

16      B.  On his second claim:

17          4.  Economic damages of $380,000;

18          5.  Non- economic damages of $300,000;

19          6.  Costs and disbursements.

20      DATED this _16th_ day of April, 2014.

21

22                                      Respectfully Submitted:
                                        HOLLANDER, LEBENBAUM & GANNICOTT
23

24

25                                      _____
                                        Gordon S. Gannicott, OSB No. 842307
26                                      Of Attorneys for Plaintiff

Page  6 - **COMPLAINT**

HOLLANDER, LEBENBAUM & GANNICOTT
Attorneys at Law
1500 S.W. First Avenue, Suite 700
Portland, Oregon 97201
Tel: (503) 222-2408
fax: (503) 222-0659

**EXHIBIT 6**

# EXHIBIT

# 7

**PGE**  **Portland General Electric Company**                    **Stephen A. Redshaw**
        *Legal Department*                                          *Associate General Counsel*
        *121 SW Salmon Street • 1WTC1301 • Portland, Oregon 97204*
        *(503) 464-2559 • Facsimile (503) 464-2200*
        *stephen.redshaw@pgn.com*

May 8, 2014

**VIA EMAIL (clclaimreports@libertymutual.com)**

Liberty Mutual Insurance Claims Representative

Re:  Joel Belgarde v. Portland General Electric Co.
     Oregon Circuit Court, Multnomah County, Case No. 1404-04814
     Liberty Mutual policy number is TB1-691-544505-011

Dear Sir:

   I represent Portland General Electric Co. ("PGE") in connection with the above-referenced Oregon state court action ("the Belgarde lawsuit"). PGE was served with the Summons and Complaint in the Belgarde lawsuit on or about April 18, 2014. A copy of the Summons and Complaint are attached.

   PGE is an additional insured under a Commercial General Liability policy issued by Liberty Mutual Insurance Co. ("Liberty Mutual") to NAES Power Contractors Inc. ("NAES"). Copies of the Certificate of Liability Insurance provide by NAES to PGE and the underlying contract between NAES and PGE are attached. Based on information and belief, the Liberty Mutual policy number is TB1-691-544505-011.

   The Belgarde lawsuit involves a NAES employee who was allegedly injured during May 2012 while working at a PGE facility located in Boardman, Oregon. Belgarde alleges claims against PGE based on Oregon's Employer Liability Law and alleged negligence. As an additional insured, PGE is covered under the NAES policy referenced above. **PGE hereby tenders the defense and settlement of the matter to Liberty Mutual.**

   PGE's first appearance in the Belgarde lawsuit is due no later than May 19, 2014. At this point, PGE has not obtained outside counsel. Please advise, in writing, whether Liberty Mutual is accepting this tender and whether PGE should obtain outside counsel, or whether Liberty Mutual will be selecting outside counsel for this matter.

EXHIBIT 7

If you need additional documents or information, please contact me. I look forward to working with you on this case.

Very truly yours,

Stephen Redshaw

Cc:    David Miner

Enc.    Summons and Complaint
Certificate of Liability Insurance
PGE-NAES Boardman Maintenance Contract Dated December 17, 2008

EXHIBIT 7

# EXHIBIT

# 8

**SCHWABE, WILLIAMSON & WYATT®**
ATTORNEYS AT LAW

Pacwest Center, 1211 SW 5th Ave., Suite 1900, Portland, OR 97204 | Phone 503.222.9981 | Fax 503.796.2900 | www.schwabe.com

**NOAH JARRETT**
Admitted in Oregon and Washington
Direct Line: 503-796-2936
E-Mail: njarrett@schwabe.com

June 25, 2014

*Via e-mail [stephen.redshaw@pgn.com]*
Stephen A. Redshaw
Associate General Counsel
Portland General Electric Company
121 S.W. Salmon, 1WTC1301
Portland, OR  97204

<div style="margin-left:2em">

Re:    Joel Belgarde v. Portland General Electric Company
       Our Client: NAES Power Contractors, Inc.
       Our File No.:  PENDING

</div>

Dear Stephen:

    This firm and I represent NAES Power Contractors, Inc. ("NAES"), and have been asked to respond to your letter of May 8, 2014, to Liberty Mutual Insurance regarding the *Joel Belgarde v. Portland General Electric Co.* matter.  The indemnity purportedly required by the Boardman maintenance contract is not enforceable under Oregon law.

    Oregon worker's compensation law unequivocally vitiates indemnity agreements between employers and third parties for employee injuries.  Please see ORS 656.018(1).  Mr. Belgarde was an employee of NAES at the time of his alleged injury and his sole remedy against NAES is the worker's compensation system.  That exclusivity cannot be avoided by a claim for indemnity by a third party.

    Oregon's law regarding insurance coverage in construction agreements is similarly unequivocal.  The Boardman maintenance contract falls squarely within that law.  Any provision in a construction agreement that requires a person to indemnify a third party from the third party's own negligence is unenforceable.  Please see ORS 30.140(1).  That provision was interpreted and enforced in *Walsh Construction Company v. Mutual of Enumclaw*, 338 Or 1, 4, 104 P3d 1146 (2005).  That court made clear that the statute prohibits both direct indemnity arrangements between parties to construction agreements, and also additional insured arrangements under which one party is obligated to procure insurance for losses arising in whole or in part from another's fault.

PDX\113733\143514\NJA\14082111.1

<u>EXHIBIT 8</u>

Stephen A. Redshaw
June 25, 2014
Page 2

     Mr. Belgarde's suit against PGE alleges fault by PGE, only. Oregon law prohibits PGE from requiring NAES to indemnify or insure PGE for PGE's own negligence. Accordingly, NAES must respectfully deny the tender of the *Joel Belgarde v. Portland General Electric* matter.

     If you would like to discuss this further, please do not hesitate to contact me.

                Very truly yours,

                Noah Jarrett

NJA:emc

cc:    Philip Kasin
       David Miner
       Chris Howard
       David Anderson

S&W

**EXHIBIT 8**

# EXHIBIT

# 9

**From:** Stephen Redshaw
**Sent:** Wednesday, June 25, 2014 3:56 PM
**To:** 'Smith, Michael E'
**Subject:** RE: Joel Belgarde v Portland General Electric Co. Our file number: P 949-269438-01

Mr. Smith:

Please see the attached letter I received today from an attorney representing NAES in connection with the above-referenced matter. As you know, PGE has tendered the defense and settlement of this claim to Liberty Mutual as an additional insured under the policy referenced in prior correspondence. To date, Liberty Mutual has neither accepted nor denied the tender. As you can see, NAES has denied any responsibility. Whether NAES' position is correct or not, PGE did not tender anything to NAES. PGE is incurring costs and has been forced to retain outside counsel. Please respond in writing – Is Liberty Mutual denying the tender and, if so, why?


Stephen A. Redshaw
Portland General Electric Co.
Associate General Counsel
Stephen.redshaw@pgn.com
Office:   (503) 464-2559
Cell:     (503) 421-7856



**From:** Smith, Michael E [mailto:MICHAELE.SMITH@LibertyMutual.com]
**Sent:** Monday, May 12, 2014 12:47 PM
**To:** Stephen Redshaw
**Subject:** Joel Belgarde v Portland General Electric Co. Our file number: P 949-269438-01

Stephen,

Thank you for speaking with me concerning this subject lawsuit. Per our discussion, your tender demand has been received and we will be looking to formally address that issue as soon as possible. However, since this is the first report of this matter to Liberty Mutual, it is doubtful that we will be able to complete our review by 05/19/2014. Please proceed to answer on your own behalf while we continue to review your tender demand and investigate this matter. If we determine that our insured owes defense and/or indemnification to PGE, we will advise on what terms, if any, we will accept that defense and/or indemnification.

1

<u>EXHIBIT 9</u>

In the meantime, should you receive any additional information that might be helpful in our initial investigation and review of your tender demand, please forward. Should you have any questions, please feel free to contact me.

Michael Smith | Technical Claims Specialist

Liberty Mutual Insurance

Commercial Insurance Claims

Auto/Liability – Southwest Region

800-672-0834 Ext 32235

Direct line:  469-242-8735

(Fax) 888-325-8127

MIchaele.Smith@LibertyMutual.com

Mailing address: PO Box 7214, London, KY 40742-7214

This e-mail, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, please notify me via return e-mail and via telephone and permanently delete the original and any copy of any e-mail and any printout thereof.

EXHIBIT 9

# EXHIBIT

# 10

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

JOEL BELGARDE,                          )
                                        )
                    Plaintiff,          )
                                        )
        vs.                             )   Case No. 1404-04814
                                        )
PORTLAND GENERAL ELECTRIC COMPANY,      )
an Oregon corporation,                  )
                                        )
                    Defendant.          )
_____     )


DEPOSITION OF JOEL BELGARDE

Taken in behalf of Defendant

February 9, 2015

EXHIBIT 10

1    you it was built for PGE?

2              A.   I just recall being told that it was built for

3    PGE.

4              Q.   Who told you that?

11:10:39  5        A.   Rusty Morris.

6              Q.   Who is Rusty Morris?

7              A.   Russell Morris.

8              Q.   Russell Morris?

9              A.   I believe his real name is Russell.

11:10:56  10       Q.   And who does Mr. Morris work for?

11             A.   He was second or third in command over the

12   boilermakers when Foster Wheeler had the maintenance

13   contract.

14             Q.   When did Mr. Morris tell you that the air

11:11:10  15   cannon was built by Foster Wheeler?

16             A.   I was working for Foster Wheeler at the Beaver

17   plant.  Rusty Morris was in charge.  That job was finishing

18   up, and they were going to transfer all of those employees

19   to Boardman for the shutdown.  And they had a conversation

11:11:38  20   about this new air cannon that they were building that was

21   going to make the air heater job much faster and more

22   efficient.

23             Q.   And what did he tell you about that?

24             A.   Basically, that's all.

11:12:02  25       Q.   Did he tell you that the air cannon was

EXHIBIT 10

```
1    designed by anybody in particular?

2            A.   Not -- not that I know.

3            Q.   Did he tell you that anyone had seen a similar

4    device used at any other facility?

11:12:23  5          A.   No.

6            Q.   Have you ever worked at Boardman before this

7    conversation with Rusty Morris?

8            A.   No.

9            Q.   Were you, in fact, transferred to Boardman?

11:12:40  10         A.   Yes.

11           Q.   Was that your first time on the job out there?

12           A.   Yes.

13           Q.   So, this would have been 1994?

14           A.   Yes.

11:12:48  15         Q.   Do you know if in 1994 there was an air cannon

16   that was actually used at Boardman?

17           A.   I believe so.

18           Q.   Did you have any role in building that tool?

19           A.   No.

11:13:06  20         Q.   Do you know who built it?

21           A.   Rusty Morris, Bob Fiocchi (phonetic spelling).

22   They were -- they were foremen and supervisors for Foster

23   Wheeler at that time.

24           Q.   Were they both boilermakers, too?

11:13:42  25         A.   Yes.
```

EXHIBIT 10

| | |
|---|---|
| 1 | Q. Do you know where they built it? |
| 2 | A. No. |
| 3 | Q. And when we went out there and looked at it a |
| 4 | couple months ago, there were actually two of them. Do you |
| 11:13:57  5 | know if they built two in 1994? |
| 6 | A. I believe there were always two. |
| 7 | Q. Is there a fabrication shop in the maintenance |
| 8 | contractors area at Boardman? |
| 9 | A. Yes. |
| 11:14:17  10 | Q. Do you know if that's where the air cannon was |
| 11 | built? |
| 12 | A. I don't know. |
| 13 | Q. You don't know whether it was built on site or |
| 14 | off site? |
| 11:14:27  15 | A. When I was in Beaver, I was part of a |
| 16 | conversation where they were talking about this new air |
| 17 | cannon, and they were all excited that it was going to |
| 18 | speed up the work. That was the first time I ever heard of |
| 19 | such a thing. |
| 11:14:55  20 | Q. Why would it speed up the work? |
| 21 | A. Probably takes the place of half a dozen men. |
| 22 | Q. How is that? |
| 23 | A. To move this large heavy object into position. |
| 24 | Q. And how does the air cannon replace the men |
| 11:15:20  25 | who would otherwise have to do that? |

EXHIBIT 10

1    A.    The men would have to rig it into place using

2    various hoists.   The air ram just kind of shoves it in a

3    hole.

4    Q.    So did you understand that before 1994 during

11:15:43  5    an outage on the reheaters the men would have to rig the

6    new pieces into place?

7    A.    I would assume so, but I was never told that

8    or witnessed that.

9    Q.    What's the process for removing those pieces

11:15:58  10    when they need to come out to be cleaned or removed, just

11    removed?

12    A.    They were pulled out with an air tugger.

13    Q.    What's an air tugger?

14    A.    A winch, basically.

11:16:13  15    Q.    An air-driven winch?

16    A.    Yes.

17    Q.    Did you ever see them installed using a

18    similar device?

19    A.    No.

11:16:27  20    Q.    Did you ever see them installed using anything

21    other than the air cannon?

22    A.    No.

23    Q.    Do you know where the air cannon was stored?

24    A.    No.

11:16:43  25    Q.    Do you know if Foster Wheeler took it when the

MARCIA MAY & ASSOCIATES - 503.784.6903

EXHIBIT 10

1    happened when you had the accident that caused the injury

2    that we're here talking about today?

3             Well, let me go back before we get to that.

4             Who trained you in using the air cannon?

11:20:21   5      A.    Nobody.

6      Q.    Why not?

7      A.    I don't think anybody on that job had ever

8    used it before.

9      Q.    Who told you to use it?

11:20:39   10      A.    My assistant foreman.

11      Q.    What's his name?

12      A.    There were two. Martin Hebert was one, but my

13    specific, Charles; his first name was Charles.

14      Q.    Was it typical for you to be told to use a

11:21:08   15   tool that you had not been trained how to use?

16      A.    No. I had been trained to use most tools.

17      Q.    Have you ever been told as a boilermaker to

18    use a tool that you hadn't been trained on?

19      A.    I'm trying to recall a tool I hadn't been

11:21:39   20   trained to use, other than the air cannon. Every other

21    tool we used we had been trained with.

22      Q.    Did it cause you any concern that your

23    assistant foreman was telling you to use a tool you hadn't

24    had training on?

11:21:57   25      A.    Yes.

EXHIBIT 10

1    Q.   Did you ask him for training?

2    A.   He'd never used it.

3    Q.   Did he tell you that in response to your

4    asking him for training, or --

11:22:08  5    A.   He said to me, "I'm going to have you run the

6    air cannon because you have the most experience in this

7    area," to which I responded, "Well, I've never used the air

8    cannon."

9         And he said, "You're still the most

11:22:24 10    experienced person I have in the crew."

11    Q.   How long was it before the accident that you

12    were told that you were the guy who was going to be running

13    the air cannon?

14    A.   It was about a week.

11:22:37 15    Q.   Were any of the other folks that you've talked

16    about who had experience running the cannon on site in May

17    of 2012?

18    A.   Just Dave Jeffries.  He was running the other

19    air cannon.

11:22:56 20    Q.   Did he give you any training on how to use the

21    air cannon?

22    A.   I believe it was the first time he had ever

23    used the air cannon.

24    Q.   Was the air cannon discussed at the NAES

11:23:16 25    safety meeting at any time, any occasion that you can

EXHIBIT 10

1    recall in 2012?

2              A.    Yes.

3              Q.    When was it discussed?

4              A.    I don't know a specific day, but it was

11:23:25   5    usually when it was, we were using it, the discussion at

6    the safety meeting was clearance, keeping the area taped

7    off, keeping people from other projects and PGE personnel

8    from standing behind it.

9              Q.    Did anyone ever -- anyone at NAES ever tell

11:23:57  10    you that the air to the air cannon should be shut off

11    before it was moved?

12              A.    (Shaking head.)

13              Q.    Is that a no?

14              A.    No.

11:24:12  15              Q.    Had you ever worked with pneumatic tools that

16    had to be shut off before you move them?

17              A.    None like that.

18              Q.    Have you ever worked with a pneumatic tool

19    where you had to take, turn the air off before you could

11:24:33  20    move the tool to a new location?

21              A.    Yes.

22              Q.    Was that a safety reason?

23              A.    It's just common sense, if I'm removing a tool

24    from a job site --

11:24:52  25              Q.    And I'm not saying --

EXHIBIT 10

1    A.   -- to a job site.

2    Q.   -- from a job site.

3         I'm saying did you ever have occasion to work

4    any with pneumatic tools where you set it up to work in one

11:25:03   5    location and then you have to move it, set it up to work in

6    another location?

7    A.   I'm assuming that it would go to a new source

8    of air or remain --

9    Q.   Remain with the same air.

11:25:16   10   A.   I wouldn't shut the air off.

11   Q.   Were there shutoffs available at the source of

12   the air if you had chosen to shut the air off before moving

13   the air cannon?

14   A.   The other end of the air hose was attached to

11:25:39   15   the mill air, which was one floor higher, half a floor, one

16   floor, up a set of stairs.

17   Q.   Did the hose between the mill air and the tool

18   have any type of shutoff on it that you could reach?

19   A.   I don't recall.

11:26:01   20   Q.   So your memory is that your assistant foreman

21   told you to use the air cannon.  His first name was

22   Charles.

23   A.   (Nodding head.)

24   Q.   Is that right?

11:26:22   25   A.   Charles, yes.

EXHIBIT 10

```
 1          Q.    -- reach.

 2          A.    Yes.

 3          Q.    How many times had you done that in the prior

 4     week, that particular maneuver?

 5          A.    I think there's 24 sectors; somewhere between

 6     20 and 30 times.

 7          Q.    Did it take both you and Mr. Niemeyer to move

 8     the cannon, or could you do it by yourself?

 9          A.    Yes.  It was very awkward.

10          Q.    I asked a compound question.

11                Did it -- yes, you could do it, it took two of

12     you?

13          A.    It took the both of us to move the air cannon

14     safely.

15          Q.    And when you moved it, you would only shut it

16     off at the safety valve; is that right?

17          A.    Shut off the main valve, open the secondary

18     valve.

19          Q.    And that would, the result would be then if

20     the air, if the main valve opens, the air would just go

21     through the secondary valve; is that right?

22          A.    That's how it works out.  After we make the

23     shot, the valve's turned off, you have to open the

24     secondary valve so that the ram can be pulled back in, you

25     have to depressurize it so it could be reset.
```

Time stamps: 11:38:32 (line 5), 11:38:56 (line 10), 11:39:07 (line 15), 11:39:19 (line 20), 11:39:40 (line 25)

EXHIBIT 10

1      At that point the valve is open and stays that

2  way until you're ready to fire it again, and then that

3  valve is closed, and then the primary valve is actuated.

4      Q.   And is there a reason that you didn't shut off

11:39:58  5  the air at the source or at the hose rather than rely on

6  those two valves for the safety?

7      A.   Time.

8      Q.   Did anyone tell you not to shut it off at the

9  source?

11:40:14  10      A.   No.  Just the general practice.

11      Q.   So, tell me what happened when you and

12  Mr. Niemeyer were moving the cannon on the day that the, at

13  the time that you were injured.

14      A.   We picked it up and were stepping it forward.

11:40:44  15  The primary valve hooked in my coveralls and turned the

16  cannon on, made a lot of noise, and somewhere in the

17  confusion the secondary valve was bumped and partially

18  closed.  I believe Mr. Niemeyer was reaching for the

19  primary valve, but they're close together, and he hit the

11:41:15  20  secondary valve, and it closed most of the way, which

21  activated the ram that I had a hold of.  The piston shot

22  out, hit the basket and the ram proceeded to go the other

23  direction, with me holding onto it.

24      Q.   What side of the ram were you standing on?

11:41:39  25      A.   The right side.

EXHIBIT 10

1    Q.   Bib overalls.  Okay.

2    A.   Carhartt.

3    Q.   Do you know who had checked the air cannon out

4    of the tool room, if anyone?

11:43:32   5    A.   I have no idea.  It was already in position

6    when I arrived on the job.

7    Q.   Do you know who had connected the hoses to the

8    air, available air?

9    A.   No.

11:43:48   10    Q.   Would that have been someone else's job?

11    A.   Actually, we did, Shawn and I did.

12    Q.   Is that something you did in the morning?

13    A.   It stayed connected to the air line, unless

14    there was a reason we had to use the air line for something

11:44:16   15    else.  On occasion the whole operation would get bound up

16    inside the hole, and we would have to turn off the air line

17    and transfer it over to the air tugger so that we could

18    pull whatever object that was stuck back out.  And we'd

19    have to switch the air line back over because we only had

11:44:39   20    one hose.

21    Q.   When you did that work, how would you shut the

22    air off?  Change the hose?

23    A.   Had to climb two flights of stairs and spin

24    the valve.

11:44:51   25    Q.   There was a spin valve?

MARCIA MAY & ASSOCIATES - 503.784.6903

EXHIBIT 10

1    green.

2              Q.    Was it that color when you used it?

3              A.    It gets painted various colors at different

4    times.

11:47:57   5              Q.    Do you know who does that painting?

6              A.    Just one of those weird things that people

7    enjoy doing.

8              Q.    Is it something the boilermakers do?

9              A.    Yeah.   Too much time on their hands.

11:48:14  10              Q.    And I think when we were out there and looked

11    at this one, wasn't this the one that was not operative for

12    some reason?  Did it have a valve missing?

13              A.    No, that was the other air cannon.

14              Q.    The other one.  Okay.  And actually, I forgot

11:48:37  15    to show you Exhibit 2, which is a drawing from the

16    Complaint.  Is that your drawing?

17              A.    That is my drawing.

18              Q.    So, using Exhibit 2, can you explain for me

19    the two valves that we're talking about and which one

11:48:52  20    hooked into your overalls?

21              A.    The valve marked main valve is the valve

22    handle that was caught in my clothing.

23              Q.    So that, in this depiction, it's pointed down.

24    When it's down, is it open or closed?

11:49:16  25              A.    Closed.

EXHIBIT 10

1        Q.    That's closed.  So it caught on your loop?

2        A.    And as I stepped forward, it became parallel

3  with the cannon itself and was actuated.

4        Q.    So it turned toward the heating element,

11:49:36  5  forward, sort of up and to the right?

6        A.    Correct.

7        Q.    And that opened the valve?

8        And I didn't show you this, I didn't make a

9  copy of anything in the Complaint other than this page

11:50:32  10  because I wanted to show you the valves and have you

11  explain to me the valves, but how is it that Mr. Niemeyer

12  closed the safety valve?

13        A.    When the valve is open the handle sticks

14  straight up in the air.  That's open.  And the only thing I

11:50:57  15  can figure is he was reaching for the main valve and hit

16  it, because they're virtually next to each other.

17        Q.    And if you look at the photograph that's

18  depicted on Exhibit 3, are both of the valves there?

19        A.    I believe so.

11:51:20  20        Q.    And the main valve, from my view of this,

21  looks like it's actually underneath the pipe?

22        A.    It's a little, if you're looking down this

23  end, I would say it's at 5:00.

24        Q.    Point it out to me.

11:51:43  25        A.    (Indicating).

EXHIBIT 10

1    reaching for the safety valve, instinctively, and closed

2    it, not that it was -- that he brushed against it, or that

3    he was going for the main valve.

4             A.   I don't know exactly what his intentions were.

11:54:15  5    He was on the far side, I'm on this side (indicating), we

6    were almost facing each other.  We reached down to move it,

7    when all of a sudden it comes to life, scared us both.  He

8    just reached over at the valves, and that's -- that's all I

9    remember.  And then it just took off.

11:54:35 10             Q.   And at the time that it was, that air entered

11   it, when you closed the main valve accidentally, the safety

12   valve was actually doing its job, wasn't it?

13             A.   I'm assuming so.

14             Q.   The ram didn't actuate, it didn't kick until

11:54:55 15   somebody closed the safety valve, correct?

16             A.   Correct.

17             Q.   So it was only upon closing the safety valve

18   that Mr. Niemeyer did somehow, that the cannon was actuated

19   and kicked; is that right?

11:55:09 20             A.   I believe so.

21             Q.   Was Mr. Niemeyer still holding it at that

22   time?

23             A.   Holding --

24             Q.   The air cannon?

11:55:20 25             A.   We were both holding it.

EXHIBIT 10

# EXHIBIT

# 11

# Attn Don Anderson NAES

On or about May 1-3 (not exactly sure which Day), I reported to you at about 5:25 pm That I had injured My right Elbow At Work. You advised me to take Some Ibuprofen and asked If I needed any. I told you I thought my arm Would be OK.

The Next Morning My General foreman Approached me before Work, telling me to take it easy, And tell my foreman, Doug Velarud, if I needed to refrain From Any Activities Due to my Injury.

My Right Elbow was bruised, A Little Swollen and Sore, But I was able to resume my Job Activities as Long as I Didn't Do any Heavy Lifting or twisting with my Arm. My Arm remained Sore, But Didn't give me Too Much Concern, as I assumed It was Just Sprained and would heal with time and I Could finish Out the Shutdown,

EXHIBIT
9
Belgarde

EXHIBIT 11
JB000284
(1)

I was Laid OFF/ROF May 17th 2012. I returned home and made an appointment with my doctor to get a prescription renewed and have her take a Look at my Elbow. On May 22nd my Doctor Laura Oullette MD, was Concerned I may have Ruptured my Distal bicep tendon At the Elbow, and Referred me to an Orthopedic Doctor, Dr. Stanley. I saw Dr. Stanley the Morning of May 25th 2012. After his exam, He was Convinced I had a full or partial Rupture of my Distal Bicep Tendon At the Elbow, and told me that it Needed to be Diagnosed More thor-thoroughly And treated Quickly. He told me the Surgery Needed to be done as Soon After injury as possible as scarring would Set in. He Has Refferred me to A Dr. Peter Tsai In Corvallis. I'm Scheduled to meet With Him At 12pm May 29th 2012.

   I need to proceed with an Accident Report and get Insurance Info From you/NAES to provide my Doctors.

EXHIBIT 11

JB000285

To briefly describe the accidents

While repositioning the GooseGun/Air Cannon,
To the metal platform at the air heater Door/entrance,
the hammer Loop of my Coveralls snagged the air valve
Handle, Turning it on. The Safety Valve was open,
allowing pressure to escape without actuating the
Cannon. My CoWorker, Shawn Niemeyer, was
Startled by the Sound of escaping air, and reached
Back and closed the Safety Valve, this Charged
The Cannon/Gun. We had NOT chained the
Cannon/Gun Down Yet, So the Working End Struck
The Basket and then the portion We Were Holding
proceded to Quickly and with Much force, travel
In the opposite direction. I had a firm Grip
On the Cannon/Gun, and It violently Jerked my
Right Arm, and After full extension of the
Gun/Cannon, I turned off the Air Valve.
My Assistant foreman Marty Hebert, who witnessed
the incident Rushed over to me as I held my
arm, to See if I was OK. The Witnesses
Were, Shawn Niemeyer, Marty Hebert, and I believe
The Operator Bill Bailey was also present.

<span style="text-align:right">**EXHIBIT 11**</span>

JB006286

(5)

# EXHIBIT

# 12

Susan M. Carnell
Recovery Specialist
Recovery Services International

RECEIVED

FEB 09 2015

February 6, 2015

HOLLANDER, LEBENBAUM
& GANNICOTT

**RSI**

Recovery Services International, Inc.

Gordon Gannicott, Esq.
Hollander, Lebenbaum & Gannicott
1500 SW First Ave. Suite 700
Portland, OR 97201

P. O. Box 5134
Scranton, PA 18505-0577
Telephone 503.598.1487
Facsimile 503.431.6811
susan.carnell@rsintl.com

| | |
|---|---|
| RSI FILE NUMBER: | C494C2807695 |
| CLIENT COMPANY: | ACE American Ins. Co. (AAIC) |
| CLIENT INSURED: | NAES Corp. |
| DATE OF EVENT: | 5/20/2012 |
| PLACE OF OCCURRENCE: | Boardman, OR |
| AMOUNT OF LIEN: | $199,545.57 (compensation/medical/pending) |
| YOUR CLIENT: | Joel Belgarde |

Dear Mr. Gannicott,

NOTICE OF UPDATED LIEN AND SUBROGATION INTEREST.

We are the recovery agents for the referenced client company. I have been assigned the handling of the workers' compensation lien on behalf of AAIC and NAES Corp. The amount of the lien in unchanged and the workers compensation claim has been closed.

You have requested copies of the medical bills paid under workers compensation. I attach copies of all bills. I have kept the billing in order as it is listed on the payment ledger. There is one item listed in bold that there is no billing as it was a supplemental payment from a previously paid bill.

We do pay our bills after a bill review which allows for certain bills to be reduced. If you need a copy of the subject explanation of review for these bills, please let me know.

Please keep me updated on any pertinent case developments. You may contact our office by phone at 1.800.992.7578 extension 61487 or 503.598.1487. Thank you for your attention to this matter.

Sincerely,

*Susan M Carnell*

Susan M. Carnell

Enclosure

**PLEASE REFER TO RSI FILE NUMBER ON ALL CORRESPONDENCE**

EXHIBIT 12
JB000295

| Issue Date | Check Number | Code | Amount | Payee Name | From Date | To Date |
|---|---|---|---|---|---|---|
| 3/13/2014 | CN71630736 | PP3 | $3,957.06 | BELGARDE;JOEL | 3/12/2014 | 3/12/2014 |
| 1/17/2014 | CN71329549 | PP3 | $38,256.56 | BELGARDE;JOEL | 1/15/2014 | 1/15/2014 |
| 1/17/2014 | CN71329486 | AFX | $7,625.00 | HOLLANDER, LEBENBAUM & GANNICOTT | 1/15/2014 | 1/15/2014 |
| 1/17/2014 | CN71329483 | ST | $42,375.00 | BELGARDE;JOEL | 1/15/2014 | 1/15/2014 |
| 12/23/2013 | CN71191274 | PP3 | $4,996.11 | BELGARDE;JOEL | 12/20/2013 | 12/20/2013 |
| 12/6/2013 | CN71109932 | REX | $1,045.84 | BOSTWICK KRIER & D'AUTREMONT | 11/5/2013 | 11/29/2013 |
| 11/25/2013 | CN71039989 | PP3 | $3,957.06 | BELGARDE;JOEL | 11/22/2013 | 11/22/2013 |
| 11/4/2013 | CN70918294 | TT | $1,819.34 | BELGARDE;JOEL | 10/16/2013 | 10/29/2013 |
| 10/21/2013 | CN70845967 | TT | $1,819.34 | BELGARDE;JOEL | 10/2/2013 | 10/15/2013 |
| 10/7/2013 | CN70765849 | TT | $1,819.34 | BELGARDE;JOEL | 9/18/2013 | 10/1/2013 |
| 9/23/2013 | CN70685402 | TT | $1,819.34 | BELGARDE;JOEL | 9/4/2013 | 9/17/2013 |
| 9/9/2013 | CN70599440 | TT | $1,819.34 | BELGARDE;JOEL | 8/21/2013 | 9/3/2013 |
| 8/26/2013 | CN70519708 | TT | $1,819.34 | BELGARDE;JOEL | 8/7/2013 | 8/20/2013 |
| 8/12/2013 | CN70437849 | TT | $1,819.34 | BELGARDE;JOEL | 7/24/2013 | 8/6/2013 |
| 7/29/2013 | CN70354800 | TT | $1,819.34 | BELGARDE;JOEL | 7/10/2013 | 7/23/2013 |
| 7/15/2013 | CN70268020 | TT | $1,804.57 | BELGARDE;JOEL | 6/26/2013 | 7/9/2013 |
| 7/1/2013 | CN70190624 | TT | $1,775.02 | BELGARDE;JOEL | 6/12/2013 | 6/25/2013 |
| 6/17/2013 | CN70104539 | TT | $1,775.02 | BELGARDE;JOEL | 5/29/2013 | 6/11/2013 |
| 6/3/2013 | CN70021957 | TT | $1,775.02 | BELGARDE;JOEL | 5/15/2013 | 5/28/2013 |
| 5/20/2013 | CN69942329 | TT | $1,775.02 | BELGARDE;JOEL | 5/1/2013 | 5/14/2013 |
| 5/6/2013 | CN69852112 | TT | $1,775.02 | BELGARDE;JOEL | 4/17/2013 | 4/30/2013 |
| 4/22/2013 | CN69768163 | TT | $1,775.02 | BELGARDE;JOEL | 4/3/2013 | 4/16/2013 |
| 4/8/2013 | CN69679291 | TT | $1,775.02 | BELGARDE;JOEL | 3/20/2013 | 4/2/2013 |
| 3/25/2013 | CN69593498 | TT | $1,775.02 | BELGARDE;JOEL | 3/6/2013 | 3/19/2013 |
| 3/11/2013 | CN69506620 | TT | $1,775.02 | BELGARDE;JOEL | 2/20/2013 | 3/5/2013 |
| 2/25/2013 | CN69421770 | TT | $1,775.02 | BELGARDE;JOEL | 2/6/2013 | 2/19/2013 |
| 2/11/2013 | CN69326436 | TT | $1,775.02 | BELGARDE;JOEL | 1/23/2013 | 2/5/2013 |
| 1/28/2013 | CN69246986 | TT | $1,775.02 | BELGARDE;JOEL | 1/9/2013 | 1/22/2013 |
| 1/14/2013 | CN69161429 | TT | $1,775.02 | BELGARDE;JOEL | 12/26/2012 | 1/8/2013 |
| 12/31/2012 | CN69077299 | TT | $1,775.02 | BELGARDE;JOEL | 12/12/2012 | 12/25/2012 |
| 12/17/2012 | CN68991852 | TT | $1,775.03 | BELGARDE;JOEL | 11/28/2012 | 12/11/2012 |
| 12/3/2012 | CN68887379 | TT | $1,775.03 | BELGARDE;JOEL | 11/14/2012 | 11/27/2012 |
| 11/19/2012 | CN68807089 | TT | $1,775.03 | BELGARDE;JOEL | 10/31/2012 | 11/13/2012 |
| 11/5/2012 | CN68711942 | TT | $1,775.03 | BELGARDE;JOEL | 10/17/2012 | 10/30/2012 |
| 10/22/2012 | CN68627934 | TT | $1,775.03 | BELGARDE;JOEL | 10/3/2012 | 10/16/2012 |
| 10/8/2012 | CN68538970 | TT | $1,775.03 | BELGARDE;JOEL | 9/19/2012 | 10/2/2012 |
| 9/24/2012 | CN68457548 | TT | $1,775.03 | BELGARDE;JOEL | 9/5/2012 | 9/18/2012 |
| 9/10/2012 | CN68363765 | TT | $1,775.03 | BELGARDE;JOEL | 8/22/2012 | 9/4/2012 |
| 8/27/2012 | CN68296628 | TT | $1,775.03 | BELGARDE;JOEL | 8/8/2012 | 8/21/2012 |
| 8/13/2012 | CN68203887 | TT | $1,775.03 | BELGARDE;JOEL | 7/25/2012 | 8/7/2012 |
| 7/30/2012 | CN68121657 | TT | $1,775.03 | BELGARDE;JOEL | 7/11/2012 | 7/24/2012 |
| 7/16/2012 | CN68041320 | TT | $1,775.03 | BELGARDE;JOEL | 6/27/2012 | 7/10/2012 |
| 7/2/2012 | CN67964130 | TT | $1,775.03 | BELGARDE;JOEL | 6/13/2012 | 6/26/2012 |
| 6/18/2012 | CN67874680 | TT | $887.51 | BELGARDE;JOEL | 6/6/2012 | 6/12/2012 |
| | | | $172,381.21 | | | |

EXHIBIT 12
JB000296

Page 1 of 1

| Issue Date | Check Number | Code | Amount | Payee Name | From Date | To Date |
|---|---|---|---|---|---|---|
| 9/18/2013 | CN70660271 | MAX | $1,088.00 | REHABILITATION ASSOCIATES NW | 8/22/2013 | 8/22/2013 |
| 7/10/2013 | CN70243236 | OHX | $106.76 | SAMARITAN HAND THERAPY CORVAL | 5/2/2013 | 5/2/2013 |
| 7/3/2013 | CN70209356 | MDX | $140.51 | SAMARITAN FAMILY MEDICINE AT G | 12/27/2012 | 12/27/2012 |
| 7/2/2013 | CN70202671 | MT | $231.09 | BELGARDE;JOEL | 2/5/2013 | 6/4/2013 |
| 6/20/2013 | CN70132178 | MDX | $141.56 | UPPER HAND ORTHOPAEDICS PC | 6/4/2013 | 6/4/2013 |
| 6/20/2013 | CN70132387 | OHX | $106.76 | SAMARITAN HAND THERAPY CORVAL | 5/30/2013 | 5/30/2013 |
| 6/20/2013 | CN70132388 | OHX | $106.76 | SAMARITAN HAND THERAPY CORVAL | 5/28/2013 | 5/28/2013 |
| 6/19/2013 | CN70121550 | OHX | $106.76 | SAMARITAN HAND THERAPY CORVAL | 4/25/2013 | 4/25/2013 |
| 6/19/2013 | CN70121542 | OHX | $106.76 | SAMARITAN HAND THERAPY CORVAL | 3/7/2013 | 3/7/2013 |
| 6/19/2013 | CN70121543 | OHX | $156.44 | SAMARITAN HAND THERAPY CORVAL | 3/14/2013 | 3/14/2013 |
| 6/19/2013 | CN70121544 | OHX | $74.66 | SAMARITAN HAND THERAPY CORVAL | 3/21/2013 | 3/21/2013 |
| 6/19/2013 | CN70121545 | OHX | $106.76 | SAMARITAN HAND THERAPY CORVAL | 4/1/2013 | 4/1/2013 |
| 6/19/2013 | CN70121546 | OHX | $106.76 | SAMARITAN HAND THERAPY CORVAL | 4/4/2013 | 4/4/2013 |
| 6/19/2013 | CN70121547 | OHX | $106.76 | SAMARITAN HAND THERAPY CORVAL | 4/8/2013 | 4/8/2013 |
| 6/19/2013 | CN70121548 | OHX | $106.76 | SAMARITAN HAND THERAPY CORVAL | 4/15/2013 | 4/15/2013 |
| 6/19/2013 | CN70121549 | OHX | $106.76 | SAMARITAN HAND THERAPY CORVAL | 4/22/2013 | 4/22/2013 |
| 6/18/2013 | CN70108201 | OHX | $320.28 | SAMARITAN HAND THERAPY CORVAL | 5/17/2013 | 5/23/2013 |
| 6/4/2013 | FW70028173 | DRX | $21.25 | PHARMACY | 5/7/2013 | 5/7/2013 |
| 6/4/2013 | CN70027406 | OHX | $106.76 | SAMARITAN HAND THERAPY CORVAL | 5/6/2013 | 5/6/2013 |
| 5/31/2013 | CN70010540 | OHX | $106.76 | SAMARITAN HAND THERAPY CORVAL | 4/29/2013 | 4/29/2013 |
| 5/3/2013 | CN69842817 | BMX | $125.51 | UPPER HAND ORTHOPAEDICS PC | 2/20/2013 | 2/20/2013 |
| 4/23/2013 | FW69773952 | DRX | $21.84 | PHARMACY | 3/26/2013 | 3/26/2013 |
| 4/9/2013 | CN69682056 | MDX | $696.00 | OREGON ANESTHESIOLOGY GROUP P | 2/20/2013 | 2/20/2013 |
| 4/2/2013 | CN69642578 | HLX | $6,266.48 | GOOD SAMARITAN REGIONAL MED CT | 2/20/2013 | 2/20/2013 |
| 4/1/2013 | FW69637835 | DRX | $23.83 | PHARMACY | 3/2/2013 | 3/2/2013 |
| 3/21/2013 | FW69571484 | DRX | $2.71 | PHARMACY | 2/18/2013 | 2/18/2013 |
| 3/21/2013 | FW69571738 | DRX | $23.82 | PHARMACY | 2/19/2013 | 2/19/2013 |
| 3/14/2013 | CN69532779 | MDX | $836.70 | UPPER HAND ORTHOPAEDICS PC | 2/20/2013 | 2/20/2013 |
| 3/13/2013 | CN69523753 | OHX | $213.32 | SAMARITAN HAND AND UPPER EXTREMITY | 10/15/2012 | 10/25/2012 |
| 3/13/2013 | CN69524439 | OHX | $213.32 | SAMARITAN HAND AND UPPER EXTREMITY | 11/16/2012 | 11/20/2012 |
| 2/28/2013 | CN69444024 | MDX | $207.71 | UPPER HAND ORTHOPAEDICS PC | 2/5/2013 | 2/5/2013 |
| 2/22/2013 | CN69409839 | MDX | $140.51 | UPPER HAND ORTHOPAEDICS PC | 12/11/2012 | 12/11/2012 |
| 1/21/2013 | CN69205860 | OHX | $53.33 | SAMARITAN HAND AND UPPER EXTREMITY | 12/10/2012 | 12/10/2012 |
| 1/14/2013 | CN69159434 | OHX | $213.32 | SAMARITAN HAND AND UPPER EXTREMITY | 11/27/2012 | 11/29/2012 |
| 1/14/2013 | CN69159713 | OHX | $106.66 | SAMARITAN HAND AND UPPER EXTREMITY | 12/4/2012 | 12/4/2012 |
| 1/11/2013 | CN69151069 | OHX | $106.66 | SAMARITAN HAND AND UPPER EXTREMITY | 12/6/2012 | 12/6/2012 |
| 1/9/2013 | CN69137475 | MT | $304.70 | BELGARDE;JOEL | 5/25/2012 | 12/11/2012 |
| 12/27/2012 | CN69066207 | OHX | $213.32 | SAMARITAN HAND AND UPPER EXTREMITY | 10/17/2012 | 10/22/2012 |
| 12/26/2012 | CN69049524 | OHX | $213.32 | SAMARITAN MEDICAL CLINICS | 10/3/2012 | 10/10/2012 |
| 12/24/2012 | CN69036707 | OHX | $213.32 | SAMARITAN HAND AND UPPER EXTREMITY | 11/9/2012 | 11/13/2012 |
| 12/14/2012 | CN68979512 | MRX | $14.75 | CORVALLIS RADIOLOGY | 6/6/2012 | 6/6/2012 |
| 12/13/2012 | CN68970523 | MDX | $140.51 | UPPER HAND ORTHOPAEDICS | 10/30/2012 | 10/30/2012 |
| 12/10/2012 | CN68930444 | MDX | $209.75 | UPPER HAND ORTHOPAEDICS | 10/2/2012 | 10/2/2012 |
| 12/5/2012 | CN68907336 | MDX | $106.66 | SAMARITAN HAND AND UPPER EXTREMITY | 11/6/2012 | 11/6/2012 |
| 12/5/2012 | CN68907471 | OHX | $106.66 | SAMARITAN HAND AND UPPER EXTREMITY | 11/2/2012 | 11/2/2012 |
| 11/9/2012 | CN68747939 | OHX | $106.66 | SAMARITAN MEDICAL CLINICS | 10/8/2012 | 10/8/2012 |
| 10/26/2012 | CN68663224 | BMX | $1,819.09 | BEAVER SPORTS MEDICINE | 6/6/2012 | 6/6/2012 |
| 10/23/2012 | CN68632511 | OHX | $71.11 | SAMARITAN MEDICAL CLINICS | 9/19/2012 | 9/19/2012 |

EXHIBIT 12

JB000297

| 10/22/2012 | CN68624988 | OHX | $213.32 | SAMARITAN MEDICAL CLINICS | 9/5/2012 | 9/12/2012 |
|---|---|---|---|---|---|---|
| 10/18/2012 | CN68612053 | OHX | $106.66 | SAMARITAN MEDICAL CLINICS | 9/25/2012 | 9/25/2012 |
| 9/27/2012 | CN68480196 | OHX | $319.98 | SAMARITAN MEDICAL CLINICS | 7/26/2012 | 8/29/2012 |
| 9/20/2012 | CN68443588 | MAX | $15.81 | SAMARITAN MEDICAL CLINCS | 6/6/2012 | 6/6/2012 |
| 9/20/2012 | CN68443584 | MRX | $126.34 | DIAGNOSTIC IMAGING ASSOCIATES | 6/1/2012 | 6/1/2012 |
| 9/13/2012 | FW68394043 | DRX | $20.19 | PHARMACY | 8/14/2012 | 8/14/2012 |
| 9/5/2012 | CN68341382 | MRX | $41.04 | BEAVER SPORTS MEDICINE | 8/14/2012 | 8/14/2012 |
| 8/31/2012 | CN68326226 | MDX | $106.66 | SAMARITAN MEDICAL CLINICS | 7/2/2012 | 7/2/2012 |
| 8/21/2012 | FW68259746 | DRX | $13.02 | PHARMACY | 7/3/2012 | 7/3/2012 |
| 8/21/2012 | FW68259560 | DRX | $13.03 | PHARMACY | 6/16/2012 | 6/16/2012 |
| 8/16/2012 | CN68234228 | MDX | $696.00 | OREGON ANESTHESIOLOGY GROUP P | 6/6/2012 | 6/6/2012 |
| 8/7/2012 | CN68172669 | MDX | $140.51 | SAMARITAN MEDICAL CLINICS | 5/22/2012 | 5/22/2012 |
| 8/7/2012 | CN68173697 | OHX | $181.33 | SAMARITAN MEDICAL CLINICS | 6/18/2012 | 6/18/2012 |
| 8/1/2012 | CN68138140 | MDX | $272.86 | BEAVER SPORTS MEDICINE | 6/6/2012 | 6/6/2012 |
| 8/1/2012 | CN68139212 | MRX | $46.88 | BEAVER SPORTS MEDICINE | 7/3/2012 | 7/3/2012 |
| 8/1/2012 | CN68136879 | OHX | $7,188.62 | GOOD SAMARITAN REG MED CT | 6/6/2012 | 6/6/2012 |
| 7/25/2012 | FW68099856 | DRX | $29.36 | PHARMACY | 6/26/2012 | 6/26/2012 |
| 7/11/2012 | FW68016913 | DRX | $30.43 | PHARMACY | 6/6/2012 | 6/6/2012 |
| 7/6/2012 | CN67991749 | MRX | $55.15 | BEAVER SPORTS MEDICIN | 6/15/2012 | 6/15/2012 |
| 7/5/2012 | CN67982087 | HLX | $937.27 | ALBANY GENERAL HOSPITAL | 6/1/2012 | 6/1/2012 |
| 6/22/2012 | CN67911765 | MDX | $144.58 | SAMARITAN MEDICAL CLINICS | 5/25/2012 | 5/25/2012 |
| 6/13/2012 | CN67845856 | MDX | $238.94 | BEAVER SPORTS MEDICIN | 5/29/2012 | 5/29/2012 |
| | | | $27,164.36 | | | |

I included the explantion of review (EOR)
on all pharmacy bills as this document
states what the drug was.

EXHIBIT 12
JB000298